FILED

APR 22 2016

Clerk, U S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| COREY WAGNER, individually and as the personal representative of the Estate of Nancy J. Wagner,<br><br>Plaintiff,<br><br>vs.<br><br>MINNESOTA LIFE INSURANCE COMPANY,<br><br>Defendant. | CV 15–47–M–DLC<br><br>ORDER |

This order resolves cross-motions for summary judgment currently pending in this case. Defendant Minnesota Life Insurance Company ("Minnesota Life") moved for summary judgment claiming that there is no genuine issue of material fact that Plaintiff is not entitled to accidental death benefits under the life insurance policy. Plaintiff Corey Wagner ("Corey"), individually and as the personal representative of the Estate of Nancy J. Wagner, submitted a cross-motion for summary judgment, asserting that the policy's Accidental Death and Dismemberment coverage ("AD&D") allows for basic and voluntary AD&D benefits. Defendant Minnesota Life then moved to strike Plaintiff's Affidavit and

-1-

Exhibits attached to his cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), on the basis that an administrator's benefits decision is to be determined solely on the Administrative Record and that Exhibits 3 and 4 are inadmissible hearsay.

For the reasons set forth below, Defendant's motion to strike Plaintiff's Affidavit and Exhibits is granted in part and denied in part, and summary judgment is granted in favor of Defendant and against Plaintiff.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an insurance contract dispute. Decedent Nancy J. Wagner ("Nancy") received life insurance coverage, including AD&D coverage, under her employer's group life insurance plan, policy numbers 33669 and 33670 (the "Policy"). The group plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). In pertinent part, the Policy provides an Accidental Death and Dismemberment Policy Rider which reads as follows:

### Accidental Death and Dismemberment (AD&D) Benefit

> Accidental death or dismemberment by accidental injury as used in this rider means that the insured's death or dismemberment results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen. The bodily injury must be the sole cause of death or dismemberment.

(Doc. 31 at 19.)

The rider also contains the following, relevant exclusions:

> In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberment is caused directly or indirectly by, results from, or whether there is a contribution from, any of the following:
>
> . . .
>
> 4) bodily or mental infirmity, illness or disease;
>
> 5) infection, other than infection occurring simultaneously with, and as a direct result of, the accidental injury;
>
> . . . .

(*Id.*)

On April 23, 2014, Nancy died in her home after she attempted to quit drinking alcohol after several years of alcohol abuse. She stopped drinking alcohol on her own will and was reportedly sick for several days prior to her death. Earlier that week, Nancy stumbled in her bedroom and hit her head, denting a sheetrock wall. During her detoxification on April 23, her husband, Corey, found her body on the bathroom floor and indicated Nancy was shaking and too weak to rise. Nancy was found dead shortly thereafter on her bedroom floor.

On April 24, 2014, an autopsy was performed which classified the manner of Nancy's death as natural. The pathologist's autopsy report stated that "[Nancy] most likely died as a result of chronic alcohol abuse that resulted in marked steatosis and hemorrhagic pancreatitis." (Doc. 34 at 2.) The report further found

no evidence of injury, drug use, or suspicious circumstances. Nancy's death certificate also indicated the manner of her death as "natural," the causes of which identified as "(a) Hemorrhagic Pancreatitis; (b) Marked Steatosis; and (c) Chronic Ethyl Alcohol Abuse." (*Id.*) The death certificate included the following onsets of these causes of death: "hemorrhagic pancreatitis: days; marked steatosis: years; chronic ethyl alcohol abuse: years." (Doc. 20 at 54.)

On or about June 30, 2014, Corey submitted a claim to Minnesota Life for Nancy's life insurance benefits. Minnesota Life paid Corey $169,000 under the plan's basic and voluntary life insurance coverage, but denied benefits under the basic and voluntary AD&D benefits because Nancy's death was not "accidental" under the terms of the Policy. The total amount of basic and voluntary AD&D benefits at issue is $238,000.

Corey filed suit against Minnesota Life to recover the additional basic and voluntary AD&D benefits. Defendant Minnesota Life moved for summary judgment, arguing that the clear and unambiguous policy language does not allow AD&D benefits for natural deaths. Minnesota Life argues that because Nancy's death was caused by pancreatitis, steatosis, and chronic alcohol abuse, her death was natural and not accidental.

Plaintiff countered, claiming that under the terms of the Policy, Nancy's

death resulted directly and independently from an accidental bodily injury which was unintended, unexpected, and unforeseen.[1] Corey contends that Nancy unintentionally suffered death as a consequence to her detoxification and she subjectively lacked an expectation of death or injury as the outcome of her actions. Finally, Corey asserts that the AD&D Rider's exclusion for infection does not apply because Nancy's pancreatic infection occurred simultaneous with, and as a direct result of, the accidental injury stemming from her detoxification. Therefore, Corey claims Minnesota Life's denial of AD&D benefits was unreasonable pursuant to the Policy.

Minnesota Life responded to Plaintiff's cross-motion and further argued that the AD&D Rider specifically excludes from the accidental death benefit any death that results from or is caused directly or indirectly by bodily or mental infirmity, illness, or disease. Minnesota Life contends that complications from Nancy's alcohol abuse constitutes a bodily or mental infirmity, illness or disease, which are

---

[1] The Court understands that Plaintiff's response to Defendant's motion for summary judgment is procedurally improper, as it was not filed within 21 days after Defendant's motion was filed. However, Plaintiff included his cross-motion for summary judgment within that same response motion. Thus, the Court will treat this document as Plaintiff's cross-motion for summary judgment. As such, the motion is timely, pursuant to the parties stipulated deadline to file substantive motions by January 15, 2016. (Doc. 18 at 2.)
 The Court also calls attention to Plaintiff's disregard to the United States District Court for the District of Montana's local rules. Pursuant to Rule 7.1(d), Plaintiff did not accompany his brief in support of his cross-motion with an actual motion for summary judgment, nor a certificate of compliance stating the number of words included in the brief.

excluded coverage under the Policy.

Finally, Minnesota Life moves to exclude an Affidavit and Exhibits attached to Plaintiff's cross-motion for summary judgment under Federal Rule of Civil Procedure 56(e). (Doc. 31 at 15–17; 24–33.) Minnesota Life contends that these documents are outside the Administrative Record and that Exhibits 3 and 4 are inadmissible hearsay.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. In ruling on a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing part." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 1863 (quoting

*Anderson*, 477 U.S. at 255).

In a case governed by ERISA, a summary judgment motion is the proper vehicle for a federal district court to review the propriety of the administrator's benefit decision. *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999). The appropriate standard of review in federal ERISA cases begins with the general rule that a benefits decision governed by ERISA is reviewed de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits. If discretionary authority exists, then trust principles regulate and an abuse of discretion standard is applied. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Pursuant to 29 U.S.C.A. § 1002(16)(A), the term "administrator" means "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor." Under an abuse of discretion standard, the appropriate inquiry "is not into whose interpretation of the plan documents [i.e., the administrator's or the district court's] is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Saffle, v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) (citation omitted).

However, even if an abuse of discretion standard applies, there are circumstances in which a less deferential standard should be applied: when the administrator or fiduciary is operating under a conflict of interest. *Metro. Life*, 554 U.S. at 111–12. If the "plan administrator both evaluates claims for benefits and pays benefits claims" then a conflict of interest results, and the court should weigh that conflict of interest as a factor in determining whether there is an abuse of discretion. *Id.* at 112, 115. Thus, in the presence of a conflict, a court should determine, based on the facts and circumstances of the particular case, if the administrator's decision to deny benefits was motivated by improper considerations. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

## ANALYSIS

### I. Appropriate Standard of Review

Here, the Court must first examine whether the terms of the ERISA plan at issue unambiguously grant discretion to the administrator to determine benefits. This Court has reviewed the Administrative Record in its entirety and cannot find an explicit designation anywhere in the Policy or the various Policy documents whereby Minnesota Life is defined as the administrator. However, the general definitions of the Policy defines "we, our, us" as Minnesota Life Insurance

-8-

Company. Therefore, since the designation "we" is used throughout the Policy to confer discretion to Minnesota Life to determine benefits, it appears that Minnesota Life is the administrator of the Policy. Moreover, given the circumstances of the case—Minnesota Life denying AD&D benefits—it seems appropriate that Minnesota Life is the administrator of the Policy.

Nevertheless, in the interest of fairness to Plaintiff, the Court cannot conclude with absolute certainty that the plan indeed granted discretionary authority to Minnesota Life as the administrator of the ERISA Policy. As such, the Court will review Minnesota Life's decision to deny Plaintiff's claim for the basic and voluntary AD&D benefits under a de novo standard of review.

## II. Motion to Strike

Defendant moves to strike Plaintiff's Affidavit and Exhibits attached to his cross-motion for summary judgment. A district court is limited "to the administrative record when the court is reviewing a [benefits decision] on the merits for an abuse of discretion; consideration of new evidence is permitted only in conjunction with de novo review of a denial of benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006) (citation omitted). Evidence not part of the administrative record should be considered "through the lens of the traditional rules of summary judgment." *Nolan v. Heald College*, 551 F.3d 1148,

1155 (9th Cir. 2009). An affidavit may support a motion for summary judgment if it is made on personal knowledge. Fed. R. Civ. P. 56(c)(4). Thus, since this Court is reviewing the case under a de novo standard, it may consider new evidence not included in the administrative record if it complies with the Federal Rules of Evidence and Federal Rules of Civil Procedure.

After reviewing the Administrative Record, Plaintiff's cross-motion for summary judgment contains some Exhibits that are within the administrative record and some that are not. Corey R. Wagner's Affidavit comports with Federal Rule of Civil Procedure 56(c)(4) because all the facts contained therein are based on his personal knowledge. The Advisory Committee notes to the Federal Rule of Evidence 802 adhere to this narrow exception admitting Rule 56 affidavits. Therefore, the Affidavit is admissible.

Exhibits 1 and 2, the AD&D Policy Rider and Minnesota Life claim records, are found within the Administrative Record and are admissible. However, Exhibits 3 and 4 are not found within the Administrative Record and are subject to the Federal Rules of Evidence. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002) (citing Fed. R. Evid. 801(c)). Without a procedural rule

or statute applicable to the evidence, hearsay is inadmissible unless it falls under Rule 801(d) or a hearsay exception under Rules 803, 804, or 807. *Id.*

Exhibits 3 and 4, a two page case report for acute haemorrhagic pancreatitis and a six page review of infection in acute pancreatitis, respectively, are written by people other than the declarant and are offered by Plaintiff to prove the truth of the matter asserted, that Nancy's death was sudden and accidental. Thus, these Exhibits constitute inadmissible hearsay. Being that the Plaintiff did not provide any supporting evidence as to the Exhibits' admissibility and no exception under the Federal Rules of Evidence applies to these Exhibits, Exhibits 3 and 4 constitute hearsay and are inadmissible.

### III. Whether the Policy precludes coverage for basic and voluntary AD&D benefits.

When considering questions of insurance policy interpretation under ERISA, federal courts must apply federal common law. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002); *Firestone*, 489 U.S. at 110. Under federal common law, a court interprets insurance policies "in an ordinary and popular sense as would a person of average intelligence and experience." *Padfield*, 290 F.3d at 1125. "Where a plan instrument does not define a term, [a court] may 'look to the dictionary definition to determine the ordinary and popular

-11-

meaning.'" *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 628 (9th Cir. 2008) (citing *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007)).

Here, the AD&D Rider defines the term "accidental death or dismemberment by accidental injury" as "the insured's death or dismemberment results, directly and independently of all other causes, from an accidental bodily injury." (Doc 31 at 19.) The "accidental bodily injury" is defined as an injury which is "unintended, unexpected, and unforeseen." (*Id.*) The rider further provides that the "bodily injury must be the sole cause of death." (*Id.*) Therefore, "if the death was not accidental, the policy is not even triggered, and it is unnecessary to examine the applicability of any exclusion." *Padfield*, 290 F.3d at 1126.

Since the plan adequately and unambiguously defines the term "accidental bodily injury," the Court must interpret this definition from the view of an ordinary person of average intelligence and experience. It is clear that an accidental bodily injury under the Policy is one that is unintended, unexpected, and unforeseen. "In determining whether death, or the injury that caused death, was unexpected or unintentional, courts have undertaken an overlapping subjective and objective inquiry." *Padfield*, 290 F.3d at 1126. This two part test

analyzes: (1) "whether the insured subjectively lacked an expectation of death or injury" and "whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences"; and (2) "[i]f the subjective expectation of the insured cannot be ascertained, the court asks whether the expectations of a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct." *Id.* The second part of the test is appropriate because "it best allows the objective inquiry to 'serve as a good proxy for actual expectation.'" *Id.* at 1127.

Plaintiff claims that Nancy lacked an expectation that her cessation from alcohol would result in death or injury. Plaintiff cites *Padfield v. AIG Life Insurance Co.* and *Santaella v. Metro Life Insurance* in support of his argument. 290 F.3d 1121; 123 F.3d 456 (7th Cir. 1997). Plaintiff is correct that Nancy subjectively lacked this expectation and that any reasonable person under the same or similar circumstances would also lack this expectation.

In *Padfield*, the insured died from an accidental result of autoerotic asphyxiation. *Padfield*, 290 F.3d at 1124. Yet, the insurer denied accidental death benefits on the basis of its policy's suicide exclusion and the intentional self-

-13-

inflicted injury exclusion. In *Padfield*, using the two part test, the Ninth Circuit concluded the plaintiff's subjective expectation was to garner sexual gratification, not to injure himself, and that, from a purely objective analysis, death was not the "'substantially certain' result of autoerotic asphyxiation." *Id.* at 1127. Thus, the plaintiff's death was accidental and not a suicide.

Looking further into the subjective expectation of the insured, the Ninth Circuit found that autoerotic asphyxiation is not an intentionally self-inflicted injury. *Id.* at 1129. Due to the plaintiff's use of autoerotic asphyxiation for merely heightened sexual experiences, all evidence suggested that he did not intentionally attempt to injure himself. *Id.* It was not until an "accident" occurred, whereby the plaintiff did not return to consciousness as he normally did under the same circumstances. *Id.* Therefore, he had no subjective intent to cause the injuries that resulted in his death.

*Padfield* is analytically identical to *Santaella*. In *Santaella*, the insured died from a propoxyphene overdose and the insurer denied accidental death benefits based on the intentional self-inflicted injury exclusion. The insurer argued that the plaintiff "reasonably should have foreseen that serious injury or death was likely to occur as a result of her voluntary ingestion of propoxypehene." *Santaella*, 123 F.3d at 462. Further, the insurer claimed that the plaintiff abused drugs from some

-14-

time "and, as a result, she had an enlarged spleen and damaged lymph system and suffered a seizure two months before her death." *Id.*

Analyzing the situation from the point of the insured, the Seventh Circuit found the plaintiff had no subjective expectation that she was taking a lethal amount of the pain reliever propoxyphene. *Id.* at 463. While the family reported a history of drug abuse, the record was silent as to the extent of that condition. *Id.* The record also indicated that the plaintiff experienced seizures sometime before her death and took those situations seriously by seeking the proper medical treatment. *Id.* at 463–64. No evidence suggested that the plaintiff's drug use played any part in her seizure episodes. *Id.* at 464. Even though the plaintiff's autopsy showed an enlarged spleen and damaged lymph system in her body and the autopsy report noted that such damage could result from drug abuse, "the pathologist testified that neither splenomegaly nor lymphadenopathy was a cause of her death." *Id.* Moreover, under the circumstances, even a reasonable person in the plaintiff's situation would lack an expectation that death or injury would be substantially certain to result from the ingestion of this particular dosage of the medication. *Id.* at 463. Therefore, the Seventh Circuit concluded that the insured's death was an accidental overdose of propoxyphene and her act was not a purposeful self-infliction of injury. *Id.* at 465.

The Policy exclusion at issue here is not the suicide exclusion or intentional self-inflicted injury exclusion at issue in *Padfield* and *Santaella*, but is the exclusion for accidental injuries resulting from bodily or mental infirmity, illness or disease. First, this Court concludes that under the Ninth Circuit's subjective and objective test, Nancy's death was an accident. However, the AD&D Rider's "bodily or mental infirmity, illness, or disease" exception applies and, thus, the Plaintiff is not entitled to AD&D benefits.

To determine whether Nancy's death was accidental, *Padfield* and *Santaella* provide the Court with guidance. Similar to *Padfield*, where the insured died from an accidental use of autoerotic asphyxiation, and *Santaella*, where the insured's use of drugs was considered an accidental overdose, here Nancy accidentally died as a result of her voluntary decision to quit drinking alcohol. First, the Court must inquire into the subjective expectation of the insured. The evidence suggests that Nancy's subjective expectation was to survive the experience of her alcohol cessation. Nothing in the record suggests that Nancy subjectively expected otherwise.

There is no conclusive evidence that reveals Nancy understood the harmful effects and potentially fatal consequence of her immediate cessation. During the few days leading up to her death, Nancy was very ill from her detoxification, but

decided against seeking medical help. Both Nancy's husband, Corey, and their son reported to authorities on the day of her death that throughout the day she was weak. Her son noted that she was shaking, pale, and appeared dehydrated since her eyes were looking dry. All of this evidence simply indicates the basic signs of alcohol withdrawal from a person that immediately quit drinking alcohol in hopes to better her health, and does not suggest Nancy was subjectively aware of her potential death. Furthermore, the record does not indicate whether she had previously attempted to stop drinking alcohol. Thus, this likely being Nancy's first attempt to completely cease alcohol consumption, and since she planned a long future watching her children grow and attending their events, her expectation of survival certainly was reasonable. (Doc. 31 at 16.)

Under an objective analysis, the same conclusion results. Death is not a "substantially certain" result of quitting drinking alcohol. Any reasonable person in Nancy's situation would believe that the cessation of alcohol consumption is done to better one's health, and that the immediate withdrawal symptoms would only be temporary. Minnesota Life presented an in-house medical opinion to support the denial of the claim that death from hemorrhagic pancreatitis brought on by alcohol abuse is well documented in the literature. This Court is not persuaded that the in-house medical literature accurately indicates death is a

"substantially certain" result of alcohol cessation, nor that a reasonable person has common knowledge of this potentially fatal outcome. Therefore, even an objective analysis confirms that from a reasonable person's standpoint, Nancy's voluntary act to quit drinking alcohol resulted in her accidental death.

Regardless of whether Nancy's death was accidental as defined under the Policy, Minnesota Life's denial of AD&D benefits was proper because the "bodily or mental infirmity, illness or disease" exception precludes recovery. Examining the exclusion in its "ordinary and popular sense as would a person of average intelligence and experience," *Padfield*, 290 F.3d at 1125, it is clear that the provision applies in this circumstance. Both Nancy's husband and son attest to Nancy's alcohol abuse and reported that Nancy had been consuming large amounts of alcohol for several years. The parties do not dispute that she suffered from alcoholism.

The Webster Dictionary defines "infirmity" as "an unsound, unhealthy, or debilitated state," "illness" as "an unhealthy condition of the body or mind," and "disease" as "an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of vital functions." Philip Babcock Gove, *Webster's Third New International Dictionary* 648, 1127, 1159 (1983). Using these common sense definitions, Nancy's

-18-

alcoholism is clearly a bodily infirmity, illness, or disease. The exclusion applies if the insured's death is "caused directly or indirectly by, results from, or where there is a contribution from" the bodily illness. (Doc. 31 at 19.) Therefore, because Nancy's voluntary cessation of alcohol stemmed from her alcoholism, the bodily infirmity exclusion applies and coverage is precluded.

## CONCLUSION

Minnesota Life properly denied AD&D benefits to its insured, Corey Wagner, individually and as the personal representative of the Estate of Nancy J. Wagner, because while Nancy's unfortunate death was accidental, her death resulted from her alcoholism. Therefore, the bodily or mental infirmity, illness or disease exclusion under the AD&D Rider is triggered and benefits are precluded in this circumstance.

Accordingly, IT IS ORDERED that:

(1) Defendant's Motion for Summary Judgment (Doc. 27) is GRANTED and Plaintiff's Cross-Motion for Summary Judgment (Doc. 31) is DENIED.

(2) Defendant's Motion to Strike (Doc. 35) is GRANTED in part and DENIED in part, consistent with this opinion.

(3) This action is DISMISSED.

DATED this 20th day of April, 2016.

/s/ Dana L. Christensen
Dana L. Christensen, Chief Judge
United States District Court